IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84487-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| TODD MIKAIL KINGMA, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — The State charged Todd Kingma with two counts of assault in the first degree, one count of drive-by shooting, and one count of unlawful possession of a firearm in the first degree. Kingma represented himself at trial and claimed self-defense. He was acquitted of one count of assault but convicted on all other counts. On appeal, he alleges insufficient evidence to disprove self-defense, governmental mismanagement that should have resulted in dismissal under CrR 8.3(b), violation of a motion in limine that should have resulted in a mistrial, prosecutorial misconduct, cumulative error, and failure to properly consider his request for an exceptional sentence. We affirm Kingma's convictions but reverse and remand for resentencing because the trial court did not properly consider his failed defenses as a mitigating factor during sentencing, as well as for correction of a scrivener's error in the judgment and sentence.

FACTS

Around 2 or 3 a.m. on October 18, 2021, Todd Kingma received a call from his daughter, Chloe Claphan, who was out with her friend, Cesalee Horner, when her ex-boyfriend showed up and "was being kind of crazy." Claphan did not feel safe and called Kingma, who said he would escort them home. The women suggested a location near their destination, but Kingma told them to meet at a Chevron gas station.

Meanwhile, Anali Daza Hernandez and two other women driving in a Honda were headed to a casino, but police pulled them over and discovered none of them had a driver's license. They called Kenan[1] Peeples, who agreed to drive them. They met at the same Chevron, with Peeples arriving in a gold Cadillac, pulling up beside the Honda and then backing up to park nearby.

Claphan and Horner arrived at the Chevron before Kingma. They saw a car with a woman in the passenger seat and a man leaning on the door of the driver's side. When Claphan and Horner saw Kingma pull into a carwash bay in his white truck, they moved to park behind him. Kingma exited the truck and walked toward Daza Hernandez's car and started talking with Peeples.

After Kingma and Peeples conversed, Kingma walked back to his truck. Peeples, Daza Hernandez, and the other two women were about to drive off in

---

[1] The record contains multiple variations for the spelling of Peeples's first name. As the State's documents in the record use "Kenan" most frequently, we use this spelling.

the Honda, when Peeples realized he had forgotten his phone in his car and went to retrieve it.

Suddenly, gunfire broke out, breaking the glass on the driver's door of the Honda. After hiding behind the Cadillac and firing his gun, Peeples ran away, stashing his gun in the wheel well of a white van and running behind a few parked cars. Shortly after, Kingma followed Peeples while continuing to shoot.

On November 18, 2021, the State charged Kingma with assault in the first degree, drive-by shooting, and unlawful possession of a firearm in the first degree. The State subsequently amended the information to add an additional count of assault in the first degree. The State alleged that Kingma had shot at Peeples and Daza Hernandez.

Kingma represented himself at trial. He argued self-defense, claiming that his daughter called him for help, and when he went to her aid, he encountered a man with a gun and fired his weapon to protect his family.

The jury acquitted Kingma of assault of Daza Hernandez and convicted on the other three counts. At his sentencing hearing, Kingma requested an exceptional sentence downward based on his failed self-defense claim. The court denied the request and imposed a mid-standard range sentence of 280 months for the assault and 100 months each for the drive-by shooting and unlawful possession, to run concurrently.

Kingma appeals.

## DISCUSSION

I.    Sufficiency of the Evidence to Negate Self-Defense

At trial, Kingma claimed that he acted in defense of himself and his family. Use of force is lawful "[w]henever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person . . . in case the force is not more than is necessary." RCW 9A.16.020(3). In order to have a self-defense instruction provided to the jury, a defendant must produce some evidence tending to prove that the use of force occurred in circumstances amounting to self-defense. State v. Walker, 136 Wn.2d 767, 772, 966 P.2d 883 (1998). After the defendant meets this initial burden, the State has the burden to prove the absence of self-defense beyond a reasonable doubt. State v. Grott, 195 Wn.2d 256, 266, 458 P.3d 750 (2020).

In this case, the trial court issued a self-defense instruction to the jury:

> It is a defense to both of the charges of assault in the first degree and the charge of drive-by shooting that the force used was lawful as defined in this instruction.
> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he or she is about to be injured, or by a person who is lawfully aiding another who the person reasonably believes is about to be injured, when the force is used to prevent or in attempting to prevent an offense against the person or another, and when the force is not more than is necessary.
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar circumstances as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

4

The instruction also included that the State has the burden of proving beyond a reasonable doubt that the force was not lawful.

Kingma claims the State failed to meet its burden and there was insufficient evidence to prove the absence of his self-defense claim beyond a reasonable doubt. The State argues that a reasonable juror could determine that Kingma was the primary aggressor or acted with greater force than necessary. We agree with the State.

To determine whether sufficient evidence supports a conviction, an appellate court must "view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence, and those inferences must be interpreted in favor of the State and most strongly against the defendant. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Additionally, an appellate court "must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." Homan, 181 Wn.2d at 106.

Kingma's premise for self-defense was that he and his wife went to meet his daughter after she called him for help, and he subsequently shot at Peeples to protect himself, his wife, and his daughter. His daughter, Claphan, testified that she called her father because she was out late with her friend when her ex-

boyfriend Hector "showed up, and he was being kind of crazy" and she did not feel safe. She called Kingma, who said he would escort them home. The women suggested a location near their destination, but Kingma told them to meet at the Chevron station. Kingma chose the location, and there was no evidence that the ex-boyfriend would be at that location. This evidence undermines Kingma's claim that he had an imminent and reasonable fear of harm because he was entering a volatile situation with Claphan's dangerous ex-boyfriend.

Daza Hernandez testified to the circumstances that led her and Peeples to the Chevron parking lot late that night. Daza Hernandez and two other women intended to drive to the casino, but police pulled them over and discovered none of them had a driver's license. They called Peeples, who agreed to drive them in their Honda. Peeples and the three women were about to drive off in the Honda, when Peeples realized he had forgotten his phone in his car, a gold Cadillac, and went to retrieve it. Then a white truck drove into the first bay of the car wash. Daza Hernandez saw Kingma exit the truck and walk toward their car. She testified that Kingma started talking with Peeples, "And it didn't sound like a good talk. It sounded like yelling. And he slammed the door." Daza Hernandez continued, "And then from there, the dude from the truck walked back to his truck, and out of nowhere, that's when we just started hearing the bullets."

Daza Hernandez testified that she did not see Peeples with a gun, that he had only his phone and his wallet as he was getting back in the car after speaking with Kingma. When asked if she saw who was the first to pull out a gun,

Daza Hernandez replied that she only recalled Kingma pulling out a gun first. On cross-examination, Kingma elicited from Daza Hernandez that she did not see Peeples pull out a gun, because Peeples was behind the vehicle.

Tyiana Ford was also in the vehicle with Daza Hernandez during the shooting. She saw Kingma and Peeples talking for a minute or two. She testified that Kingma returned to his truck and then started shooting from the driver's side. Ford testified that she saw Peeples with a gun after Kingma had shot at him.

Claphan and her friend Horner arrived at the Chevron before Kingma, and they saw him pull into a carwash bay in his white truck. There were other cars and people in the lot. Claphan testified that she and Horner moved to park behind Kingma's truck, "[a]nd then right when we went to open the doors, that's when we—a gun is in my dad's hand behind his truck. . . he was like crouching behind it. And then all of a sudden, it was open fire." Horner provided additional testimony about the events and stated that Kingma shot first:

> The second I put it in park, I started seeing her dad. He didn't come and like -- it was super weird, because he didn't even acknowledge that we were there. Like the second that we parked, he got out of his truck and started backing up with a gun.
> And I instantly noticed that it was a gun, and I started freaking out. And I asked Chloe, and we heard gunshots from him first, and then we did see both cars shooting.

At trial, the State played video footage of the events from multiple angles, with Detective Vinson narrating for the jury. Several of the video clips on Exhibit 5 are side-by-side views compiled by the police of the simultaneous actions of Kingma and Peeples, respectively. In one video, Kingma is standing inside the

7

door of his white truck and appears to remove a gun from his cargo pants pocket.

At that same moment, Peeples is retrieving something from his gold Cadillac.

Detective Vinson narrated these same events as the jury watched video from

Exhibit 4:

> The male driver of the Honda is going over, went over to the driver's door of the gold Cadillac, opened the door and is reaching in. The driver of the white Dodge went back to his driver's door, opened the door, reached in, and came out with a gun in his right hand.

Peeples then walked back to the Honda where Daza Hernandez, Ford,

and the third woman were waiting for him. Kingma had his gun in his hand before

Peeples arrived back at the Honda. Kingma raised his gun as Peeples was

bending to get into the Honda. Peeples stood back up, ran behind the Honda,

and then raised his gun.

It is unclear from the video when Peeples obtained the gun. On cross-

examination, Kingma asked Detective Vinson if it was possible for the individual

in Kingma's location to see what Peeples was retrieving from the Cadillac.

Detective Vinson responded, "It is possible."

Detective Vinson narrated the close-up version of the video for the jury:

> A: In this video clip we see Mr. Kingma have [his] handgun in his right hand, switches it to his left hand as Mr. Peeples is walking -- it's out of view, but the Cadillac would be to the right. And he is walking toward the Honda.
> And Mr. Peeples starts to get into the driver's seat of the Honda. And Mr. Kingma switches the gun from his left hand to his right hand, and then comes up above the door in the A-pillar and displays the gun toward Mr. Peeples. Then Mr. Peeples starts backing up, and Mr. Kingma points the gun at Mr. Peeples.

8

Mr. Peeples gets behind the Honda, points his gun toward Mr. Kingma. And then Mr. Peeples runs from the Honda to the southeast toward where the Cadillac is parked. Mr. Kingma moves from his driver's door area to the west and out of view.

Q: Okay.

A: And then when -- I don't know. Excuse me if I'm repeating myself. When Mr. Peeples got to the back of the car, he displayed his handgun.

Q: Okay. Can you tell whether or not he is firing at that time?

A: It does not look like either one has fired a shot at that time.

Detective Vinson described the next sequence of events from a video on Exhibit 4 as it played for the jury:

Mr. Kingma moved to the back of his vehicle and to the south area of west of stall two. And shots were fired by Mr. Kingma. And Mr. Peeples moved to the back of the Honda. There's lots of little details in here.

So he moved to the back of the vehicle, pointed his gun toward Kingma, and then ran behind the gold Cadillac. In running, I believe, he was almost to the Cadillac when it appears he gets shot, and then he starts returning fire toward Kingma.

Detective Vinson testified that police did not recover any shell casings around the Honda, but they recovered shell casings behind the Cadillac and other casings near the white truck. He explained that this indicated that Kingma fired rounds toward Peeples and the people (Daza Hernandez and Ford) in the Honda, and noted, "[y]ou can see the glass break on the driver's door of the Honda."

After hiding behind the Cadillac and firing his gun, Peeples ran away from scene. Video shows Peeples stashing his gun in the wheel well of a white van and then running behind a few parked cars. Shortly after, Kingma followed behind in his white truck and continued to shoot.

9

Kingma's wife testified on his behalf. She testified that she saw Peeples grab something from a car and when Kingma told her to get back in the truck, she saw that Peeples had a gun. She agreed with Kingma that Peeples seemed aggressive and she feared for her life.

Kingma argues that "[t]his was not a case of conflicting testimony" and that no witness refuted his wife's testimony that she feared for her life, or that Peeples had a gun and Kingma could have seen him retrieve it from his car before the shooting began. But the jury also had access to video that showed the scene from several angles, side-by-side, close-up, and slowed down, and heard testimony describing the scenes on the video. Daza Hernandez testified that Peeples went to the Cadillac because he had forgotten his phone, and she saw him holding only his wallet and phone on his return to the Honda, not a weapon. Jurors also heard testimony from Claphan, Horner, and Ford about who pulled their gun first.

There was evidence to support finding that Kingma pulled out his gun, displayed it, and shot first. Moreover, Kingma continued to pursue Peeples as he ran away. Viewing the evidence in the light most favorable to the State, a rational fact finder could have found the absence of the elements of self-defense beyond a reasonable doubt. A rational jury could determine that Kingma drew his weapon and fired without any precipitating threat from Peeples, such that Kingma did not have a reasonable belief that either he or his family was about to be injured. A rational jury could also determine that Kingma did not use such force

10

as a reasonably prudent person would use under the same circumstances when he continued to shoot as Peeples ran away. The trial court instructed the jury with the proper self-defense instruction, and based on the evidence, the jury could find beyond a reasonable doubt that Kingma either lacked reasonable fear or acted with more force than necessary. Therefore, the State presented sufficient evidence to disprove self-defense beyond a reasonable doubt.

II.    Motion to Dismiss for Governmental Mismanagement

Kingma contends the trial court should have granted his CrR 8.3(b) motion to dismiss for governmental mismanagement that "forced Kingma into a Hobson's choice between his constitutional rights to adequately prepare to defend himself and to a speedy trial." Kingma bases his allegations of government misconduct or mismanagement on the State's failure to timely provide accessible discovery materials and facilitate interviews with witnesses.

Kingma began filing CrR 8.3(b) motions to dismiss as early as March 10, 2022.[2] He successfully moved for removal of two different attorneys and then decided to represent himself at trial.[3] The court granted his request to waive counsel and proceed pro se on April 5, 2022. Although his attorneys had received discovery, Kingma began filing pro se motions for access to the discovery prior to receiving official approval to represent himself. Soon after

---

[2] Kingma filed motions that included CrR 8.3(b) as a ground for dismissal on March 30, 2022, April 1, 2022, April 20, 2022, May 16, 2022, and June 17, 2022.

[3] Kingma requested removal of his first attorney because he did not think she was properly addressing his concerns. He requested dismissal of his second attorney for not filing motions as requested. Kingma's decision to fire his attorneys also related in part to their need for continuances.

waiving counsel, Kingma began requesting witness interviews. He requested standby counsel, and the court granted the request.

During a hearing on May 19, 2022, the State reported that discovery had been redacted and was ready to send to Kingma. The State provided both paper discovery and a thumb drive of digital media that day.[4] Kingma informed the court that he had received discovery from his previous attorney "except for the newly-discovered stuff," referring to the alleged victim, Daza Hernandez, of the count of assault in the first degree that had been added to the charges. The trial court put on the record that as of that date, Kingma had requested discovery. Kingma protested, stating he had records of having requested discovery at least five times and as early as November 2021. The trial court explained that it was putting in the record that Kingma was requesting specific types of discovery, because previous requests for these specific categories had been made through counsel, which differed from his general request for discovery.

At the next hearing, May 26, 2022, the trial court asked for updates on discovery and witness interviews. Kingma reported that as to discovery, "[e]verything seems to be good" except for some files with inaccessible video footage. He described that the files were on the drive, but when he clicked on them there was no footage. The State agreed to provide another thumb drive with accessible files. As for witness interviews, the State asked for a list of people

---

[4] The State appears to have provided a second version of the discovery on May 24, 2022.

whom Kingma wanted to interview and the parties discussed the logistics of his interviewing witnesses while in jail. The court ordered the State to begin setting up witness interviews as soon as possible, no later than the next week.

The court inquired about discovery and witness interviews again on June 2, 2022. Kingma was still encountering technological issues with the electronic discovery. The court ordered the State to provide Kingma with files he could access. According to the State, the file in question contained raw data and a video player. The prosecutor informed Kingma and the court, "The State can't play that portion either, but the videos contained in there, we believe are in other folders." The court told the State to provide Kingma with video that worked. The State again tried to explain: "[T]here are several folders on the thumb drive. The one folder that he is referencing has raw data. There are actually no videos on there . . . . The videos that he is referencing at the collision center are on -- in a different folder that he already has." Kingma disagreed with this explanation. The court and parties conducted a lengthy conversation about the technological issues, with a police detective making an appearance to assist in explaining the files on the thumb drive. The conclusion was that the copy of the video player on Kingma's thumb drive did not work to play the files. The State had not been aware of the issue, stating, "I didn't know that. It works on my computer. And I believe it worked on Detective Young's computer." The parties agreed the difference was likely due to the limited technology on the computer available to

13

Kingma at the jail. The State agreed to provide a new thumb drive with files Kingma could view. Kingma received this thumb drive on June 8, 2022.

As for interviews, the State was working through the logistics of setting up in-person interviews per Kingma's request. The witness list included approximately 26 witnesses. At the June 2 hearing, the court admonished the State to schedule the witness interviews. Kingma expressed that he did not feel ready to interview witnesses because he had not been able to review the video footage. The trial court noted, "many of these witnesses are not going to be related particularly to that footage." The court continued to explain, "[W]e need to start moving forward. You want this done by your speedy trial deadline. I'm trying to facilitate that." The court also told Kingma, "if something comes up later that you didn't know before and you want to ask further questions, we can facilitate another interview if we need to. One step at a time."

The prosecutor filed an affidavit with the court on June 8, 2022 that detailed problems encountered with interview scheduling. The affidavit explained that due to security reasons, the State could not provide the court-ordered day's notice for the interview visits. Additionally, the State had no ability to notify Kingma as to when interviews are to scheduled "other than to try and communicate that through his stand-by counsel." A June 2 e-mail attached to the affidavit from the prosecutor to Kingma's stand-by counsel stated, "The State will be setting up interviews next week of all the state's witnesses." The State had coordinated interviews with Marysville police on June 8, but Kingma refused

14

transport, "citing he was not available because he was not provided 24 hours advance notice and did not have all his paperwork." The State informed the court and indicated it would attempt to hold the interviews the next day.

At the June 14, 2022 hearing to discuss the omnibus order, the court revisited the issue of witness interviews. The trial court noted an affidavit from the State detailing that Kingma had declined transport for interviews on June 8, 9, and 14. The first day, he declined because he had not been notified of who the witness would be and was not prepared.[5] Kingma declined again the next day and a few days later. Kingma acknowledged his refusal to attend was because he needed to know who he was interviewing so he could prepare notes and questions. Kingma also claimed to be missing evidence that he needed for witness interviews. The trial court then advised Kingma,

> So this is what I said before, and I'll say it again. . . . [E]ven if you don't have everything you need, go, go to the interview, question them with what you have . . . . And if you need another interview, once you get more police reports or once you talk to someone else, and it raises additional questions, we can schedule additional time, but you can't refuse to go to the interview.

The court expressed concern that Kingma would request dismissal because he did not have a chance to prepare his defense or exclude witnesses he had not interviewed, and the court would "be put in the position of doing that or just continuing the case to give you more time."

---

[5] The record does not specify which witness or witnesses were made available. The State's affidavit supporting its response to the motion uses the plural "interviews," while the record from the hearing indicates a single "witness interview."

On June 17, the State reported it had previously provided Kingma with all discovery except for the CAD[6] reports, which the State had printed and provided in paper format prior to court that day. Kingma expressed additional technological issues because the thumb drive was not working. Kingma described that the drive had failed when he tried to use it: "I plugged the next one in to view it, and boom. It did a flick." The State agreed to prepare another thumb drive.

The State filed a new affidavit with the court on June 21, 2022, detailing continuing issues with scheduling interviews. On June 15, Kingma had been provided a list of seven officers from Marysville Police Department available for interviews on June 21. The interviews were confirmed on June 17. When the officers arrived for the interviews, Kingma refused to take part. The State averred, "This will be the fourth attempt to accommodate defendant's request for in-person interviews and the fourth time he has refused to participate."

When the parties reconvened for another hearing on June 24, 2022, a week before the scheduled trial, the court learned that Kingma had again declined the scheduled interviews. The trial court discussed with Kingma that "we are at a point where there's been four separate days where interviews have been set up for you, both with professional witnesses, as well as civilian witnesses, both on site at the jail and off-site where you have not—you have refused to go participate in these interviews." The court again explained that Kingma needed to participate in the interviews in order to effectively represent himself, and "your

---

[6] Computer-aided dispatch software.

refusing to participate in these interviews cannot be a basis for any kind of a dismissal action from the Court." Kingma responded that he did not have all the discovery necessary to prepare for those interviews, and the witnesses he was ready to interview had not been made available. The court reminded Kingma, "I did advise you early on before these interviews were set that I needed you to go to these interviews and participate in whatever way you could." The trial court then denied the CrR 8.3(b) motion to dismiss.

The court attempted to dissuade Kingma from going to trial the next week, telling him, "I do not believe that that is in your best interest to go forward to trial. I think that you are not prepared." The court further stated, "I'm encouraging you to request the appointment of counsel, and I would do that for you. I'm encouraging you to not go to trial next week, but if you do not want to continue this, I will go to trial with you next week." Kingma responded,

> I don't feel that I've done anything wrong, so I'm ready to proceed to trial.
> I don't feel like there is anything that Mr. Wells can put in front of me as far as officers or anything else that I wouldn't be able to answer the question -- or not answer the questions, but respond to in my defense that wouldn't shed light to the situation to the jurors and result in a verdict in my favor. So because of that, I'm ready to move forward.

The following week, on June 28, 2022, Kingma's trial began.

Kingma moved to dismiss his case under CrR 8.3(b), which allows the trial court to "dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." The party seeking dismissal

17

bears the burden of showing both misconduct and actual prejudice. State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017). The moving party must show misconduct by a preponderance of the evidence, but need not prove bad faith on the part of the prosecutor. Id. at 431. Governmental misconduct need not be willful; "simple mismanagement will suffice." Id. at 428.

We review a trial court's ruling on a CrR 8.3(b) motion for abuse of discretion. State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." Id. A discretionary decision is manifestly unreasonable or based on untenable grounds "if it results from applying the wrong legal standard or is unsupported by the record." Salgado-Mendoza, 189 Wn.2d at 427.

In ruling on Kingma's CrR 8.3(b) motion, the trial court stated, "I think that there are problems on both sides here. And they're both--- they're problems that are good faith problems." Kingma contends this was error because only "simple mismanagement" is necessary for CrR 8.3(b). See Salgado-Mendoza, 189 Wn.2d at 428. Kingma is correct that the trial court's discussion of good faith does not comply with the legal standard. "Compliance with discovery obligations—'due diligence' . . . requires more than the *absence* of bad faith." Id. at 434. Showing governmental misconduct "is considerably more lenient" than bad faith or a violation of the State's obligations under the discovery rules. Id.

Despite the trial court's error in examining the government's actions in terms of "good faith," the record supports the conclusion that there was no misconduct. Pretrial detainees who represent themselves have a right of "reasonable access to state provided resources that will enable him to prepare a meaningful pro se defense." State v. Silva, 107 Wn. App. 605, 622, 27 P.3d 663 (2001). "What measures are necessary or appropriate to constitute reasonable access lie within the sound discretion of the trial court," considering the nature of the charge, the complexity of the issues, the orderly administration of justice, safety and security concerns, and the conduct of the defendant. Id. at 622-23.

The court ordered the State to provide discovery in a format Kingma could access and to coordinate witness interviews. The State complied with these orders, navigating Kingma's limited access to technology in jail. While the State provided media that was accessible to the prosecutor, Kingma could not access the files on the computer provided by the jail. The State then had to find ways to tailor the electronic files to formats Kingma could access. The State accomplished this, although not as speedily as Kingma desired. Kingma acknowledged that as of May 19, 2022, a prior attorney had provided him with all discovery except that which was related to the new charge involving Daza Hernandez. Kingma was ultimately acquitted on that charge. Therefore, any delay on the part of the State did not prejudice Kingma's defense.

As for coordinating in-person witness interviews, "[m]eaningful access to witnesses requires at a minimum that the defendant be afforded the opportunity

to prepare for witness interviews, preferably by advance notice of both the meeting date and the names of the person to be interviewed." Silva, 107 Wn. App. at 624. As the court noted, "Those things require logistics. Those things require Mr. Wells and the agencies and the civilian witnesses to also, you know, schedule and coordinate and get their timing right." The court acknowledged, "The fact that you're representing yourself is your constitutional right to do so, but there are also limitations and problems logistically with that, because you are in jail." In this case, the State was required to follow jail procedures, which prevented communication with Kingma except through stand-by counsel. Kingma was not notified in advance of the first day of interviews. However, after the failed June 8 interview day, Kingma was informed that interviews would occur the next day, but he did not attend. Even when the State was able to give Kingma notice of specific witnesses, he declined the interviews.[7]

Kingma informed the trial court that he refused to attend the interviews because he did not have the evidence needed to question the witnesses. Meaningful access to witnesses also includes "some means by which to impeach the witness at trial should the need arise." Silva, 107 Wn. App. at 624. The trial court acknowledged that Kingma might not have all the necessary materials, but urged Kingma to attend the interviews and request follow-up interviews as

---

[7] According to Kingma, six officers were confirmed but he did not attend. He also alleges that there were "23 witnesses that were never scheduled for me to be able to interview," but again, does not specify which witnesses.

needed. Despite the court's repeated admonishments, Kingma did not attend the interviews that the State had scheduled for him.

Kingma's role in his inability to conduct witness interviews differs from cases where the government's actions amounted to misconduct. For example, in Salgado-Mendoza, the State charged the defendant with Driving Under the Influence (DUI) and planned to call a toxicologist as an expert to testify regarding DUI testing procedures. 189 Wn.2d at 425. The State initially disclosed a list of nine potential toxicologist witnesses, only one of whom would testify. Id. For five months, the State made no attempt to narrow the list until the afternoon before trial, when it narrowed the list to three names. Id. On the morning of the trial, the State identified the toxicologist who would testify, whose name it had just received that morning. Id. The Supreme Court held that "the State's failure to at least narrow the list of possible toxicology witnesses pretrial reflects mismanagement." Id. at 428. In contrast, the State provided Kingma with witness lists and attempted to coordinate interviews on multiple occasions. This was not mismanagement or misconduct on the State's part, but Kingma's choice to opt out of the interviews that had been coordinated to assist him with his own defense.

While "good faith" is not the correct standard, despite the court's misstatement, the record demonstrates that the State complied with its obligations and the trial court's orders. Access to witnesses and resources may be "awkward" but still constitutionally sufficient. Silva, 107 Wn. App. at 624. Here,

there was no government misconduct, either with regard to the video files or the witness interviews. The trial court's denial of the motion to dismiss was not an abuse of discretion.

III.    Motion for Mistrial

In a pretrial motion in limine, the State sought to introduce evidence that during a search related to a subsequent domestic violence weapon allegation, Kingma attempted to flee from police. The trial court excluded the evidence, reasoning that the contact was related to a domestic violence incident, "[s]o the consciousness of guilt wouldn't necessarily attach, because he didn't know necessarily that they were pursuing him for this case, as opposed to the one they had just contacted him on."

However, when asked during trial how the police identified Kingma as the driver of the white truck, Detective Vinson violated the motion in limine by testifying, "During the shooting, Mr. Kingma shoots the hood of his vehicle. Later on, we recover[ed] the white truck after he ran from police." Kingma immediately objected, the court sent the jury to recess, and Kingma moved for a mistrial and dismissal of all charges "based on the blatant disregard of motions in limine." The court denied the motion for a mistrial after consideration of several issues:

> The issues that bear on that for the Court are that this was the first instance that there was a violation. It has not been a cumulative number of violations.
> The issue in this case is self-defense. That is the asserted affirmative defense, and this does not touch on that directly.
> It is also anticipated that there will be evidence related to flight in this case, further in the case from testimony from other

detectives following the -- or just prior to the ultimate arrest of Mr. Kingma.

      So given those considerations, I do not find that this information would materially affect the outcome of the trial, so I'm denying the motion for the mistrial.

The court also offered a curative instruction. After conferring with standby counsel, Kingma agreed to the proposed instruction. The State asked, and the court agreed, to strike Vinson's answer. The jury returned after a 30-minute break, and immediately after Detective Vinson returned to the stand, the court instructed the jury:

      Ladies and Gentlemen of the jury, I was alerted just prior to our break, there was an objection following that, that this witness gave an answer that was nonresponsive to a question that had been posed by the prosecutor.

      That nonresponsive answer included a conclusory statement that is not part of the evidentiary record in this case. And it should not be considered by you for any reason.

      So that last answer the witness gave is hereby stricken and is to be disregarded by you altogether.

Kingma claims the trial court erred by denying his motion for a mistrial. A trial court should grant a mistrial "only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). In considering a mistrial, courts look to factors including (1) the seriousness of the irregularity; (2) whether challenged evidence was cumulative of other evidence properly admitted; and (3) whether the irregularity could be cured by an instruction. State v. Post, 118 Wn.2d 596, 620, 826 P.2d 172, 837 P.2d 599 (1992); State v. Babcock, 145 Wn. App.

157, 163, 185 P.3d 1213 (2008). Where the irregularity relates to witness testimony, "the question is 'whether . . . viewed against the background of all the evidence,' the improper testimony was so prejudicial that the defendant did not get a fair trial." State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010) (quoting State v. Thompson, 90 Wn. App. 41, 47, 950 P.2d 977 (1998)). We review the trial court's denial of a mistrial for abuse of discretion and will find such abuse only when no reasonable judge would have reached the same conclusion. Emery, 174 Wn.2d at 765.

Here, the irregularity was a brief statement that violated the motion in limine by mentioning Kingma's flight from police. The trial court struck the statement and issued a curative instruction. Kingma contends that "[t]here was no way, without overly emphasizing it, for the court to make clear to jurors precisely what it was they should not consider. Without that clarity, the idea that Kingma had fled from police was extremely likely to stick in their minds." But the court gave the curative instruction as soon as the witness returned to the stand and referred the jury directly to prosecutor's question, the witness's "nonresponsive answer," and the objection, which all occurred immediately prior to the break. Without repeating or emphasizing the exact statement, the court instructed the jury to disregard the statement. Jurors are presumed to follow the court's instruction. In re the Pers. Restraint of Phelps, 190 Wn.2d 155, 172, 410 P.3d 1142 (2018). Moreover, Kingma agreed to the curative instruction. The

court's instruction cured any prejudice such that the testimony did not materially affect the outcome of the trial. The trial court did not abuse its discretion by denying Kingma's motion for a mistrial.

IV.    Prosecutorial Misconduct

During closing arguments, the State made several statements about witnesses' reluctance to testify:

> Lastly, I want to talk about credibility. Now Mr. Peeples didn't show up. He didn't show. We tried to get him to come. He didn't come. For whatever reason, he decided not to show, but we know he was there. We see him on the video. We heard evidence and testimony that Mr. Peeples was there in the vehicle, and that he was shot through and through, so we know he was there.
> Ms. Ford, Ms. [Daza]Hernandez, they came in, reluctantly, but they appeared. Now their account of this situation seems garbled, but what is clear from both of them is they saw Mr. Kingma shooting at them, the person that arrived in the white truck.

Kingma did not object to these statements. But on appeal, Kingma claims the prosecutor committed misconduct that violated his due process right to a fair trial by arguing "without any evidence, that the state had tried unsuccessfully to obtain testimony from Peeples and that two other witnesses had been reluctant to testify."

A defendant claiming prosecutorial misconduct must prove that the prosecutor's comments were both improper and prejudicial. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). We review statements in a prosecutor's closing arguments in the context of the issues in the case, the total argument, the evidence addressed in the argument, and the jury instructions. State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). A

prosecutor has wide latitude to draw reasonable inferences from the evidence during closing argument. Id. "However, a prosecutor may not make statements that are unsupported by the evidence and prejudice the defendant." Id.

Where, as here, the defendant failed to object to an allegedly improper remark below, such failure " 'constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition of the jury.' " State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011) (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)). This high burden requires the defendant to "establish that no curative instruction would have obviated any prejudicial effect on the jury and he must establish that prejudice resulted that had a substantial likelihood of affecting the jury verdict." Thorgerson, 172 Wn.2d at 455. Courts have found prosecutorial misconduct to be flagrant and ill intentioned only "in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner." Phelps, 190 Wn.2d at 170. In such cases, the misconduct "cross[es] the line into areas of conduct that would have threatened the fundamental fairness of [a defendant's] trial." Id. at 171.

Kingma argues that "evidence that witnesses are reluctant or frightened to come to court and testify is prejudicial because it often suggests to the jury that

26

the reluctance is due to some misconduct on the part of the accused." However, the prosecutor's statement was not so specific as to the reason for the reluctance, which reduces any prejudice.

In State v. Bourgeois, witnesses testified that they were reluctant to testify, and the court noted, "Neither [witness] said that they were afraid to testify. These comments merely reflect what we assume is a reluctance, common to many citizens, to get involved in court proceedings. Such reluctance could, however, be due to many reasons other than physical fear." 133 Wn.2d 389, 404-05, 945 P.2d 1120 (1997). The court described the prejudicial effect of this direct witness testimony as "slight." Id. at 404. Moreover, when the State's closing argument included statements that several witnesses had to be arrested on material witness warrants, the court determined that the trial court had properly instructed the jury that counsel's argument were not evidence and to disregard remarks not supported by the evidence. Id. at 406. As a result, the State's comments during closing argument were not sufficiently prejudicial to warrant a new trial. Id.

In this case, like in Bourgeois, the State did not cite fear or threats as the specific reason for reluctance. Thus, any prejudice from the prosecutor's statement was slight. The trial court also issued a similar jury instruction to the one in Bourgeois: "[T]he lawyer's statements are not evidence. The evidence is the testimony and the exhibits . . . You must disregard any remark, statement, or argument that is not supported by the evidence." The court reiterated this instruction during Kingma's closing argument, stating that "the statements of [the

27

prosecutor] and Mr. Kingma during closing arguments are not evidence. The evidence is the testimony and the exhibits that were given at trial. . . . You must disregard any remarks, statements or argument that is not supported by the evidence or the law in my instructions." This instruction, provided twice, cured any prejudicial effect of the prosecutor's statements.

Kingma cannot demonstrate that the prosecutor's statements about witnesses' reluctance to testify were so flagrant and ill-intentioned that they could not be cured by an instruction. Therefore, Kingma waived his claim of prosecutorial misconduct as to these statements.

V.     Cumulative Error

Kingma argues for reversal of his conviction due to cumulative error. The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." Id. The defendant "bears the burden of showing the accumulated prejudice from multiple trial errors resulted in substantial prejudice that denied him a fair trial." In re Pers. Restraint of Lui, 188 Wn.2d 525, 565, 397 P.3d 90 (2017). Here, Kingma has not shown that either the violation of the motion in limine or the prosecutor's statements about reluctant witnesses were error. The trial court issued a curative instruction and struck the statement violating the motion in limine. As to the prosecutor's statements in closing, Kingma did not object to the prosecutor's remarks. Moreover, case law

28

suggests that the statements were only "slightly" prejudicial and cured by the instruction that prosecutor's statements are not evidence and to disregard statements which were not supported by testimony or exhibits. Bourgeois, 133 Wn.2d at 406. Because Kingma fails to identify any error, the cumulative error doctrine does not apply.

VI.     Exceptional Sentence

Kingma contends the trial court abused its discretion in sentencing by failing to properly consider his request for an exceptional downward sentence based on his failed self-defense instruction. We agree.

Under the Sentencing Reform Act (SRA), a sentence within the standard range is not appealable. RCW 9.94A.585(1). However, "this rule does not preclude a defendant from challenging on appeal the underlying legal determinations by which the sentencing court reaches its decision." State v. McFarland, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017). Every defendant is entitled to have an exceptional sentence actually considered, and standard range sentences are appealable where the court has refused to exercise discretion or has relied on an impermissible basis to refuse an exceptional sentence below the standard range. Id. "A trial court errs when . . . it operates under the 'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible.' " Id. at 56 (quoting In re Pers. Restraint of Mulholland, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)).

Kingma requested an exceptional sentence below the standard range based on "incomplete defenses."[8] The court may impose a sentence outside the standard range for "substantial and compelling reasons." RCW 9.94A.535. Among the mitigating circumstances for an exceptional sentence below the standard range, the court may consider whether, "[t]o a significant degree, the victim was an initiator, willing participant, aggressor, or provoker of the incident." RCW 9.94A.535(1)(a). The Washington Supreme Court has agreed that mitigating factors such as those identified in RCW 9.94A.535(1)(a) " 'recognize[] that there will be situations in which a particular legal defense is not fully established, but where the circumstances that led to the crime, even though falling short of establishing a legal defense, justify distinguishing the conduct from that involved where those circumstances were not present.' " State v. Pascal, 108 Wn.2d 125, 136, 736 P.2d 1065 (1987) (quoting David Boerner, SENTENCING IN WASHINGTON, § 9.12(c) (1985)). The Legislature has determined that such "failed defenses" may support an exceptional sentence below the standard range. State v. Whitfield, 99 Wn. App. 331, 336, 994 P.2d 222 (1999).

Here, the trial court noted the failure of Kingma's defenses, stating "the jury has rejected your claim of defense of others. The jury has rejected your

---

[8] At sentencing, Kingma cited RCW 9.94A.535(1)(c) as grounds for an exceptional sentence based on an incomplete defense. RCW 9.94A.535(1)(c) provides for the mitigating circumstance that "[t]he defendant committed the crime under duress, coercion, threat, or compulsion insufficient to constitute a complete defense but which significantly affected his or her conduct." Kingma also stated that "at least one of the parties who was in the incident was firing weapons as well," referencing, without specifically citing, RCW 9.94A.535(1)(a). On appeal, Kingma addresses only RCW 9.94A.535(1)(a).

claim of self-defense. The jury has convicted you of three of the four counts. . . . [T]hat is their verdict, and I must sentence you accordingly to that verdict." The court relied on the jury's decision to deny an exceptional sentence. But the failure of Kingma's defenses is precisely the reason RCW 9.94A.535(1)(a) might apply to mitigate his sentence. It appears that the trial court's denial of Kingma's request was based on the mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence due to the jury's verdict, and was, therefore, and abuse of discretion. We reverse and remand to the trial court for resentencing to include consideration of an exceptional sentence based on Kingma's asserted mitigating factors.[9]

VII.   Statement of Additional Grounds

In his statement of additional grounds, Kingma raises the trial court's denial of his motion to dismiss for governmental misconduct.[10] Kingma claims the State unreasonably delayed his ability to prepare for trial, citing a failure to

---

[9] The parties agree that the judgment and sentence contains a scrivener's error that must be corrected. The first page of the judgment and sentence indicates Kingma is guilty of first degree assault as charged in count two. However, the jury acquitted him of count two. The other pages of the judgment and sentence accurately document his acquittal on that count. The new judgment and sentence entered after resentencing should be corrected to properly reflect the jury's verdict.

[10] Kingma also argues cumulative error based on the detective's violation of the motion in limine by mentioning Kingma's flight, and the prosecutor's statements about reluctant witnesses during closing argument. These claims were briefed by Kingma's appellate counsel and discussed above. As part of the cumulative error claims, Kingma contends the prosecutor bolstered or vouched in violation of RPC 3.4(f) by stating the witnesses were reluctant to testify. There is no RPC 3.4(f). Assuming Kingma meant to cite RPC 3.4(e), which prohibits lawyers from, inter alia, stating a personal opinion as to the credibility of a witness, the prosecutor said nothing about the witnesses' credibility and, therefore, did not vouch for the witnesses.

provide timely discovery of "material evidence" as required by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Brady defines the government's disclosure obligations in criminal prosecutions: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. For a Brady violation, a defendant must demonstrate the State, either willfully or inadvertently, suppressed evidence favorable to the accused which resulted in prejudice. State v. Mullen, 171 Wn.2d 881, 895, 259 P.3d 158 (2011). We review claims of Brady violations de novo. In re Pers. Restraint of Mulamba, 199 Wn.2d 488, 498, 508 P.3d 645 (2022).

Kingma does not explain what evidence the State suppressed in violation of Brady. Therefore, he cannot establish that the State suppressed favorable evidence. His Brady claim fails. Similarly, Kingma cites to RPC 3.8(d),[11] which obligates prosecutors to timely disclose exculpatory and mitigating evidence, without providing any specifics as what evidence the State failed to provide.

Kingma's specific evidentiary issues arise outside the Brady context. He contends the State failed to secure Peeples, a material witness, and produce him for trial. But evidence indicates that Peeples was present for an interview on one

---

[11] A prosecutor must "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal." RPC 3.8(d).

of the days Kingma refused to conduct interviews. Moreover, Peeples did not appear or testify at trial. The State did not offer any out-of-court statements that would have required the State to attempt to procure attendance by process or reasonable means. See State v. Beadle, 173 Wn.2d 97, 113, 265 P.3d 863 (2011) (where the confrontation clause is implicated by unavailability of a witness, the State must make good faith effort to secure the witness's presence at trial); ER 804(a)(5).

Additionally, Kingma supports his claim that the State violated its duty to secure Peeples by citing to United States v. Montgomery, 998 F.2d 1468, 1470 (9th Cir. 1993), which considered the government's use of reasonable efforts to produce a confidential informant outside of Brady. The existence of a confidential informant provides a specific context that makes Montgomery inapplicable to Kingma's case. Courts have recognized the dangers of confidential informants and have often required the government to show reasonable efforts to produce them for interviews or trial. Montgomery, 998 F.2d at 1472-73. Here, Peeples was not a confidential informant, but a witness, participant, and victim in the encounter.

Kingma's other evidentiary claim is that the State was aware that a witness for the defense would not be available after July 5, 2022, such that there would be no option to continue the case, so he "was forced to choose between two constitutionally protected rights." This echoes his claims that governmental misconduct required him to choose between adequate preparation and a speedy

33

trial. As discussed above, on June 14, 2022, Kingma asserted without equivocation that he was ready for trial the following week. Kingma did not want a continuance, and by his own assertion, he was ready for trial in advance of that July unavailability of the defense witness. The witness's unavailability never became relevant and could not result in prejudice.

CONCLUSION

Because Kingma has not demonstrated any grounds for reversal of his convictions, we affirm. However, because the trial court failed to properly consider his request for a mitigated sentence, we reverse and remand for resentencing, as well as correction of the scrivener's error to properly reflect the jury's verdict.

_Chung, J._

WE CONCUR:

_Bruuma, J_  _Mann, J._